MCC:MEM:mel:1999V00378

FILED
WILLIAMSPORT, PA

JUL - 3 2002

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

EMANUEL THOMAS NEWMAN,
      Plaintiff

v.  :  Civil No. 1:CV-01-0677
    (Rambo, J.)

RONALD L. JURY, Lieutenant,
SIS, et al.,
      Defendants

### DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

This is a failure to protect case filed under Bivens by a federal prisoner, Emanuel Thomas Newman. Defendants are two employees of USP Allenwood: Lieutenant Louis Caprio and Lieutenant James White.[1] Newman alleges these staff members allowed him to be assaulted on May 14, 1999, by another inmate, Kevin Tinsley, despite the fact that Newman sought defendants' protection prior to the day of the assault.

As explained below, defendants are entitled to summary judgment as the allegations do not rise to the level of a constitutional violation.

### Statement of Facts

On April 16, 1999, at approximately 11:55 a.m., a call for assistance was made by staff in USP Allenwood's Food Service Dish Room. See Record to Brief in Support of Defendants' Motion For

---

[1] Defendant Ronald L. Jury was dismissed with prejudice, pursuant to Fed. R. Civ. P. 41(a), on March 19, 2002.

Summary Judgment ("R.") at 5 (SIS Report dated April 30, 1999).[2] Staff who responded to the call observed Newman and inmate Albert Gass struggling with one another on the floor in the dish room. The inmates were separated and escorted to the institutional hospital for treatment of their injuries. Id.

When interviewed by staff about the incident, Gass stated that "[i]f that guy [Newman] would have stopped playing games with me, I would never had struck him with the stainless steel drainer." Based on Gass' statement, staff went to the dish room and located a stainless steel "drainer" with blood on it and showed it to Gass. Gass identified the item as the weapon he used to assault Newman. Newman also identified it as the weapon. Id.

Newman remained in the Health Services Unit for continuing medical care for his injuries until April 21, 1999, at which time he was placed in the Special Housing Unit (SHU) in an

---

[2] Pages 4 through 6 and 10 through 12 of the Record to Brief in Support of Defendants' Motion For Summary Judgment are copies of investigative reports prepared by Special Investigative Services ("SIS") at USP Allenwood. Because the information contained in the SIS reports could potentially threaten the security of staff, inmates, and the institution, this document has been submitted for an in camera review only. See Ponte v. Real, 471 U.S. 491, 499 (1985)(if prison security or similar paramount interests are involved, the court may consider evidence in camera).

2

administrative detention status pending an investigation.³ R. 8 (Administrative Detention Order).

On April 17, 1999, Newman requested to speak with Lieutenant Forrest Farmer concerning the assault which took place the day before. R. 14 (Farmer Decl., ¶ 5). Newman told the Lieutenant that Gass had assaulted him because for the past few weeks Gass had been attempting to get Newman to give Gass commissary items in return for protection. Newman stated that he had told Gass that he had been locked up for a long time and refused to be extorted. Therefore, Newman ignored Gass. Id.

Newman then told Lieutenant Farmer that on April 16, 1999, during the serving of the noon meal, he had been working on the north side of the dish room, next to the entrance door. Newman noticed that all of the other inmates had departed the dish room except for Gass. According to Newman, Gass then approached Newman and struck him in the head with a blunt object. Newman said he broke away from Gass and tried to leave the dish room, but the door was locked. Newman ran around the dish machine when Gass caught him, so Newman grabbed Gass and took him to the floor. Newman said that he held Gass there until the Food Service Foreman arrived. Id. (Id., ¶ 6).

---

³ Newman is not alleging a failure to protect claim regarding the April 16, 1999, assault, as Newman himself characterizes this assault as occurring "suddenly and without provocation." (See Compl., ¶ 10.)

3

Newman told the Lieutenant that the only reason he was telling him what happened was because he felt Gass was trying to kill him. Newman did not want Gass to get away with the assault even though he might be branded a "snitch." Id. (Id., ¶ 7.) Following this discussion with Newman, Lieutenant Farmer prepared a memorandum summarizing their conversation and provided a copy to the Acting Captain. R. 13 (Id., ¶ 4); 15 (Id., ¶ 8); 17.

Based on the SIS' investigation into the assault, it was concluded that the attempted extortion by Gass was the motivation for the assault on Newman. R. 6. As set forth in the SIS report submitted in camera, an appropriate course of action was recommended in response to the assault. Id.

On May 9, 1999, defendant Caprio was informed by Correctional Officer Couch that an unidentified inmate had approached him and stated, "You might want to watch out for Newman if he keeps running his mouth." R. 19 (Caprio Decl., ¶ 5). Based on this information, staff located Newman and escorted him to the Lieutenant's Office to be interviewed regarding the statement made by the unidentified inmate. Id. (Id., ¶ 6).

Lieutenant Caprio told Newman that he had heard he may be having problems in general population. Newman stated that he was not involved with anyone and pleaded not to be placed in the SHU. Id. (Id., ¶ 8.)

4

According to Newman, he had a minor argument with inmate Kevin Tinsley a few weeks earlier. Specifically, Newman said that he had done some legal work for Tinsley and tried to be honest with Tinsley by telling him that it did not look like he was going to be able to beat the case. Tinsley told Newman that it was his job to make it work and make it look good. R. 20 (Id., ¶ 9). Newman told the Lieutenant that he did not want to get involved with Tinsley and left it at that. Id. (Id., ¶ 10).

Newman said he had no problems with Tinsley, which he stated was obvious from the fact that they had been on the compound together since the argument and nothing had happened between them. Id. Newman further stated to Lieutenant Caprio that he got along with everyone and that somebody would have to be "brain dead" to mess with him or any of his people (referring to Nation of Islam). R. 20 (Id., ¶ 11). As defendant wrote in a memorandum immediately following the interview, Newman said he is an old man and if he felt threatened, he would come to the Lieutenant's Office before anything happened. R. 24.

Newman pleaded not to be removed from general population and placed into the SHU. R. 21 (Id., ¶ 13); 24. He requested that he be allowed to remain in general population and assured Lieutenant Caprio that he knew of no threat to his safety. Id. Based upon the investigation which had failed to reveal evidence that a specific threat existed to Newman, and Newman's own

5

request to stay in general population, Lieutenant Caprio concluded the interview and allowed Newman to remain in general population. Id. (Id., ¶ 14); 24. Had Newman actually informed the Lieutenant of a specific threat to his safety and asked that appropriate measures be taken to protect him, the defendant would have placed Newman in the SHU in an administrative detention status pending further investigation. Id. (Id., ¶ 15); 24.

Contrary to the allegations in the complaint, Lieutenant White--the second named defendant to this suit--did not interview Newman on May 12, 1999. R. 26 (White Decl., ¶ 4). Additionally, the Lieutenant does not recall Newman ever approaching him and asking him to take measures to ensure his safety. Id. Had Newman done so, Lieutenant White would have placed Newman in the SHU in an administrative detention status pending an investigation. Id. (Id., ¶ 5).

On May 14, 1999, a call for assistance was made by a correctional officer in Unit 3A when he observed inmate Kevin Tinsley striking and punching Newman in the face and body. R. 11-12 (SIS Report, submitted in camera). When interviewed by staff following the assault on Newman, Tinsley stated that Newman had been "spreading the word" on the compound that Tinsley had encouraged inmate Gass to commit the April 16, 1999, assault. R. 11. Tinsley said that because Newman had been spreading rumors about him, tension had escalated between Tinsley and Newman, and

6

therefore, Tinsley believed he had to assault Newman to "save face." <u>Id.</u> Newman refused to make a statement during his interview with SIS staff. <u>Id.</u> Newman and Tinsley were not separatees prior to the May 14, 1999, assault. R. 11-12.

Defendants Caprio and White deny intentionally violating any of Newman's constitutional rights. R. 21 (Caprio Decl., ¶ 16); 26 (White Decl., ¶ 6).

### Argument

**A.   <u>Newman Has Failed to Plead Sufficient Facts to Establish an Eighth Amendment Claim of Failure to Protect.</u>**

Although prison officials are required to take reasonable steps to provide for the safety of prisons, prison officials are not the absolute guarantor of prisoners' safety. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994); <u>Hamilton v. Leavy</u>, 117 F.3d 742, 746 (3rd Cir. 1997); <u>Heine v. Receiving Area Personnel</u>, 711 F. Supp. 178, 184 (D. De. 1989). To state an eighth amendment claim of failure to protect, an inmate must plead more than negligence but, rather, must establish that the prison officials acted with "deliberate indifference." <u>Farmer</u>, 511 U.S. at 832-34; <u>Davidson v. Cannon</u>, 474 U.S. 344, 347 (1986) (lack of due care causing serious injury to a prisoner does not violate due process).

To state an eighth amendment claim, two prongs must be satisfied. First, the deprivation, i.e., the risk of assault, must, objectively, be sufficiently serious. <u>Farmer</u>, 511 U.S. at

7

834. Next, because it is only the unnecessary and wanton infliction of pain which implicates the eighth amendment, the prison official must have acted with deliberate indifference. That is, the prison official must <u>both</u> know of <u>and</u> disregard an excessive risk to inmate health or safety. <u>Id.</u> at 837; <u>Wilson v. Seiter</u>, 501 U.S. 294, 299 (1991)("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837. "The question ... is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" <u>Id.</u> at 843.

Newman is not alleging a failure to protect claim regarding the April 16, 1999 assault by inmate Gass. <u>See</u> Compl., ¶ 10. It is the assault by inmate Tinsley on May 14, 1999, that Newman claims would not have occurred had defendants appropriately protected him.

As stated above, Lieutenant Caprio met with Newman on May 9, 1999, to discuss whether Newman was having a problem in general population. He also prepared a memorandum immediately following that interview to summarize their conversation. As this

8

memorandum states, Lieutenant Caprio gave Newman the opportunity to tell him about a specific threat to his safety. Newman stated that he was not involved with anyone and pleaded not to be placed in the SHU. Newman specifically told the Lieutenant on May 9, 1999 that if he felt threatened, he would come to the Lieutenant's Office before anything happened. Newman requested that he be allowed to remain in general population and assured Lieutenant Caprio that he knew of no threat to his safety. R. 18-24 (Caprio Decl.).

Lieutenant White did not interview Newman prior to the assault nor does he recall ever interviewing Newman. He also does not recall Newman ever approaching him and asking him to take measures to ensure his safety. R. 26 (White Decl., ¶ 4).

There is no reason why either defendant would not have complied with a request by an inmate to be placed into protective custody. In fact, both defendants have declared under penalty of perjury that had Newman informed them of a threat to his safety and asked them to take appropriate steps to protect him, they would have placed the inmate in the SHU pending investigation. R. 21 (Caprio Decl., ¶ 15); R. 26 (White Decl., ¶ 5).

Although prison officials are required to take reasonable steps to provide for the safety of prisoners, prison officials are not the absolute guarantor of prisoners' safety. Farmer v. Brennan, 511 U.S. 825, 834 (1994). When Lieutenant Caprio was

9

informed by Officer Couch that an unidentified inmate approached him and stated, "You might want to watch out for Newman if he keeps running his mouth," Lieutenant Caprio had Newman located in general population and escorted to the Lieutenant's Office to discuss this concern. Newman repeatedly denied any threat to his safety and pleaded not to be placed in the SHU for his protection. Thus, Lieutenant Caprio took reasonable steps to investigate the rumor regarding Newman's safety and determined, in his correctional judgment, that Newman could remain in general population.

As noted above, in order to be liable for an eighth amendment violation, defendants Caprio and White must have known of <u>and</u> disregarded an excessive risk to Newman's health or safety. <u>Farmer</u>, 511 U.S. at 837; <u>Wilson v. Seiter</u>, 501 U.S. 294, 299 (1991). Newman assured Lieutenant Caprio on May 9, 2002, that he knew of no threat to his safety. Likewise, Lieutenant White denies ever interviewing Newman or ever being requested by Newman to take appropriate measures to safeguard him. Therefore, neither defendant had any knowledge of a risk to Newman's health or safety.

Newman is not alleging a negligence claim against the government, but rather, he is alleging a claim of deliberate indifference on the part of individual defendants. Newman has failed to show that the defendants' conduct or lack thereof rose

to the level of deliberate indifference. Summary judgment in defendants' favor is therefore appropriate.

**B.    Defendants Are Entitled to Summary Judgment Based on the Doctrine of Qualified Immunity.**

It is well-settled that government officials sued in their individual capacity under Bivens-type actions have available the defense of qualified immunity. See Butz v. Economou, 438 U.S. 478 (1978); Hynson v. City of Chester, 827 F.2d 932 (3rd Cir. 1987); Wilson v. Schillinger, 761 F.2d 921, 929 (3rd Cir. 1985). The rationale supporting the doctrine of qualified immunity is the need to avoid distracting federal officials from their government duties and to avoid deterring able people from public service. A government official should be able to perform his or her duties without fear of personal liability impacting his or her judgment. Harlow v. Fitzgerald, 457 U.S. 800, 806-07 (1982). As it applies to federal officers accused of constitutional wrongdoing, the doctrine of qualified immunity as set out in Harlow, provides that a good faith bar to suit can be established where the official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

In Saucier v. Katz, 531 U.S. 991, 121 S.Ct. 2151 (2001), the Supreme Court reiterated the two-step qualified immunity inquiry that must be "considered in proper sequence." Id. at 2155. First, in deciding whether a defendant is protected by qualified

11

immunity, the court must determine whether, "[t]aken in the light most favorable to the party asserting injury, ... the facts alleged show the officer's conduct violated a constitutional right." Id. at 2156. If so, the court must then determine whether the right violated was clearly established in a "particularized ... sense: ... the relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 2156. Additionally, the Supreme Court emphasized that a ruling on qualified immunity "should be made early in the proceedings so that the costs and expense of trial are avoided where the defense is dispositive." Id.

In the present case, the facts do not establish a violation of Newman's eighth amendment rights. As discussed above, defendant Caprio took reasonable steps to ensure that there was not a threat to Newman's health or safety by calling Newman to the Lieutenant's office to investigate the comment from the unknown inmate. Newman assured Lieutenant Caprio that he knew of no threat to his safety from inmate Tinsley or any other inmate and requested that he be allowed to remain in general population.

Defendant White has no recollection of ever interviewing Newman or Newman ever approaching him and asking him to take measures to ensure his safety. Both defendants have declared under penalty of perjury that had Newman informed them of a

12

threat to his safety and asked that they take appropriate steps to protect him, Newman would have been placed in SHU for his protection pending investigation.

Defendants did not violate Newman's constitutional rights. They acted in accordance with Bureau of Prisons' written policies. As such, they are entitled to qualified immunity.

C. **Defendants Are Entitled to an Entry of Summary Judgment in Their Favor.**

Pursuant to Fed. R. Civ. P. 56, summary judgment is appropriately entered when the moving party demonstrates, by affidavit or otherwise, that there is no genuine issue as to any material fact to be resolved. See Peterson v. Lehigh Valley District Counsel, 676 F.2d 81, 84 (3d Cir. 1982); Continental Insurance v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982). The Supreme Court has ruled that Fed. R. Civ. P. 56(c) "mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 324.

In Anderson v. Liberty Lobby, 477 U.S. 242, the Supreme Court held that non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. See also, Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Further, an opposing party cannot defeat summary judgment simply

13

by asserting that a jury might disbelieve an opponent's affidavit. Anderson, 477 U.S. at 256-57.

The declarations in this case show that Lieutenant Caprio was not aware of a specific threat to Newman's safety prior to the May 14, 1999 assault. Defendant Caprio's memorandum clearly shows that on May 9, 1999, he was unaware of a specific threat to Newman. In fact, the plaintiff himself assured Lieutenant Caprio that he did not have any problems in general population. Defendant White has sworn that he did not meet with Newman prior to the May 14, 1999 assault. He has also declared under penalty of perjury that had Newman informed him of a threat to his safety and asked to be protected, he would have placed Newman in the SHU pending investigation.

It is unreasonable to expect that the authorities can make a penitentiary a risk free institution. Turner v. Miller, 679 F. Supp. 441, 443 (M.D. Pa. 1987), citing Walker v. United States, 437 F. Supp. 1081, 1082 (D. Ore. 1977). Defendants complied with established case law and Bureau of Prisons' written policies. As such, they are entitled to summary judgment.[4]

---

[4] Additionally, any claims against defendants in their official capacities, which is the equivalent of suing the BOP or the United States, should be dismissed as barred by sovereign immunity. See, e.g., Federal Deposit Insurance Corp. v. Meyer, 510 U.S. 471, 484-86 (1994); United States v. Yakima Trial Court, 806 F.2d 853, 858 (9th Cir. 1986).

14

## Conclusion

Wherefore, defendants request this Court to grant them summary judgment with a certification that any appeal will be deemed frivolous, lacking in probable cause and not taken in good faith.

Respectfully submitted,

THOMAS A. MARINO
United States Attorney

MARK E. MORRISON
Assistant U.S. Attorney
MICHELE E. LINCALIS
Paralegal Specialist
316 Federal Building
240 West Third Street
Williamsport, PA 17703

Date: July 3, 2002

```
              UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF PENNSYLVANIA


EMANUEL THOMAS NEWMAN,           :
          Plaintiff              :
                                 :
     v.                          :   Civil No. 1:CV-01-0677
                                 :   (Rambo, J.)
RONALD L. JURY, Lieutenant,      :
SIS, et al.,                     :
          Defendants             :
```

CERTIFICATE OF SERVICE BY MAIL

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on July 3, 2002, she served a copy of the attached

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Williamsport, Pennsylvania.

Addressee:

Emanuel Thomas Newman
Reg. No. 13418-039
FCI Pekin
P.O. Box 5000
Pekin, IL 61555-5000

*Michele E. Lincalis*
MICHELE E. LINCALIS
Paralegal Specialist