MCC:MEM:mel:1999V00378

FILED
WILLIAMSPORT, PA

JUL - 3 2002

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

EMANUEL THOMAS NEWMAN,           :
        Plaintiff                :
                                 :
    v.                           :  Civil No. 1:CV-01-0677
                                 :  (Rambo, J.)
RONALD L. JURY, Lieutenant,      :
SIS, et al.,                     :
        Defendants               :

**STATEMENT OF FACTS**

1. On April 16, 1999, at approximately 11:55 a.m., a call for assistance was made by staff in USP Allenwood's Food Service Dish Room. See Record to Brief in Support of Defendants' Motion For Summary Judgment ("R.") at 5 (SIS Report dated April 30, 1999).[1]

2. Staff who responded to the call observed Newman and inmate Albert Gass struggling with one another on the floor in the dish room. The inmates were separated and escorted to the institutional hospital for treatment of their injuries. Id.

---

[1] Pages 4 through 6 and 10 through 12 of the Record to Brief in Support of Defendants' Motion For Summary Judgment are copies of investigative reports prepared by Special Investigative Services ("SIS") at USP Allenwood. Because the information contained in the SIS reports could potentially threaten the security of staff, inmates, and the institution, this document has been submitted for an in camera review only. See Ponte v. Real, 471 U.S. 491, 499 (1985)(if prison security or similar paramount interests are involved, the court may consider evidence in camera).

3. When interviewed by staff about the incident, Gass stated that "[i]f that guy [Newman] would have stopped playing games with me, I would never had struck him with the stainless steel drainer." Id.

4. Based on Gass' statement, staff went to the dish room and located a stainless steel "drainer" with blood on it and showed it to Gass. Gass identified the item as the weapon he used to assault Newman. Newman also identified it as the weapon. Id.

5. Newman remained in the Health Services Unit for continuing medical care for his injuries until April 21, 1999, at which time he was placed in the Special Housing Unit (SHU) in an administrative detention status pending an investigation.[2] R. 8 (Administrative Detention Order).

6. On April 17, 1999, Newman requested to speak with Lieutenant Forrest Farmer concerning the assault which took place the day before. R. 14 (Farmer Decl., ¶ 5).

7. Newman told the Lieutenant that Gass had assaulted him because for the past few weeks Gass had been attempting to get Newman to give Gass commissary items in return for protection. Id.

---

[2] Newman is not alleging a failure to protect claim regarding the April 16, 1999, assault, as Newman himself characterizes this assault as occurring "suddenly and without provocation." (See Compl., ¶ 10.)

2

8. Newman stated that he had told Gass that he had been locked up for a long time and refused to be extorted. Therefore, Newman ignored Gass. Id.

9. Newman then told Lieutenant Farmer that on April 16, 1999, during the serving of the noon meal, he had been working on the north side of the dish room, next to the entrance door. Newman noticed that all of the other inmates had departed the dish room except for Gass. Id.

10. According to Newman, Gass then approached Newman and struck him in the head with a blunt object. Id.

11. Newman said he broke away from Gass and tried to leave the dish room, but the door was locked. Newman ran around the dish machine when Gass caught him, so Newman grabbed Gass and took him to the floor. Id.

12. Newman said that he held Gass there until the Food Service Foreman arrived. Id. (Id., ¶ 6).

13. Newman told the Lieutenant that the only reason he was telling him what happened was because he felt Gass was trying to kill him. Newman did not want Gass to get away with the assault even though he might be branded a "snitch." Id. (Id., ¶ 7.)

14. Following this discussion with Newman, Lieutenant Farmer prepared a memorandum summarizing their conversation and provided a copy to the Acting Captain. R. 13 (Id., ¶ 4); 15 (Id., ¶ 8); 17.

15. Based on the SIS' investigation into the assault, it was concluded that the attempted extortion by Gass was the motivation for the assault on Newman. R. 6.

16. As set forth in the SIS report submitted *in camera*, an appropriate course of action was recommended in response to the assault. Id.

17. On May 9, 1999, defendant Caprio was informed by Correctional Officer Couch that an unidentified inmate had approached him and stated, "You might want to watch out for Newman if he keeps running his mouth." R. 19 (Caprio Decl., ¶ 5).

18. Based on this information, staff located Newman and escorted him to the Lieutenant's Office to be interviewed regarding the statement made by the unidentified inmate. Id. (Id., ¶ 6).

19. Lieutenant Caprio told Newman that he had heard he may be having problems in general population. Newman stated that he was not involved with anyone and pleaded not to be placed in the SHU. Id. (Id., ¶ 8.)

20. According to Newman, he had a minor argument with inmate Kevin Tinsley a few weeks earlier. Specifically, Newman said that he had done some legal work for Tinsley and tried to be honest with Tinsley by telling him that it did not look like he was going to be able to beat the case. Tinsley told Newman that

4

it was his job to make it work and make it look good. R. 20 (<u>Id.</u>, ¶ 9).

21. Newman told the Lieutenant that he did not want to get involved with Tinsley and left it at that. <u>Id.</u> (<u>Id.</u>, ¶ 10).

22. Newman said he had no problems with Tinsley, which he stated was obvious from the fact that they had been on the compound together since the argument and nothing had happened between them. <u>Id.</u>

23. Newman further stated to Lieutenant Caprio that he got along with everyone and that somebody would have to be "brain dead" to mess with him or any of his people (referring to Nation of Islam). R. 20 (<u>Id.</u>, ¶ 11).

24. As defendant wrote in a memorandum immediately following the interview, Newman said he is an old man and if he felt threatened, he would come to the Lieutenant's Office before anything happened. R. 24.

25. Newman pleaded not to be removed from general population and placed into the SHU. R. 21 (<u>Id.</u>, ¶ 13); 24.

26. He requested that he be allowed to remain in general population and assured Lieutenant Caprio that he knew of no threat to his safety. <u>Id.</u>

27. Based upon the investigation which had failed to reveal evidence that a specific threat existed to Newman, and Newman's own request to stay in general population, Lieutenant Caprio

5

concluded the interview and allowed Newman to remain in general population. Id. (Id., ¶ 14); 24.

28. Had Newman actually informed the Lieutenant of a specific threat to his safety and asked that appropriate measures be taken to protect him, the defendant would have placed Newman in the SHU in an administrative detention status pending further investigation. Id. (Id., ¶ 15); 24.

29. Contrary to the allegations in the complaint, Lieutenant White--the second named defendant to this suit--did not interview Newman on May 12, 1999. R. 26 (White Decl., ¶ 4).

30. Additionally, the Lieutenant does not recall Newman ever approaching him and asking him to take measures to ensure his safety. Id.

31. Had Newman done so, Lieutenant White would have placed Newman in the SHU in an administrative detention status pending an investigation. Id. (Id., ¶ 5).

32. On May 14, 1999, a call for assistance was made by a correctional officer in Unit 3A when he observed inmate Kevin Tinsley striking and punching Newman in the face and body. R. 11-12 (SIS Report, submitted in camera).

33. When interviewed by staff following the assault on Newman, Tinsley stated that Newman had been "spreading the word" on the compound that Tinsley had encouraged inmate Gass to commit the April 16, 1999, assault. R. 11.

34. Tinsley said that because Newman had been spreading rumors about him, tension had escalated between Tinsley and Newman, and therefore, Tinsley believed he had to assault Newman to "save face." Id.

35. Newman refused to make a statement during his interview with SIS staff. Id.

36. Newman and Tinsley were not separatees prior to the May 14, 1999, assault. R. 11-12.

37. Defendants Caprio and White deny intentionally violating any of Newman's constitutional rights. R. 21 (Caprio Decl., ¶ 16); 26 (White Decl., ¶ 6).

Respectfully submitted,

THOMAS A. MARINO
United States Attorney

*[signature]* for

MARK E. MORRISON
Assistant U.S. Attorney
MICHELE E. LINCALIS
Paralegal Specialist
316 Federal Building
240 West Third Street
Williamsport, PA 17703

Date: July 3, 2002

7

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

EMANUEL THOMAS NEWMAN, :
      Plaintiff :
       :
    v. : Civil No. 1:CV-01-0677
       : (Rambo, J.)
RONALD L. JURY, Lieutenant, :
SIS, et al., :
      Defendants :

### CERTIFICATE OF SERVICE BY MAIL

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on July 3, 2002, she served a copy of the attached

### STATEMENT OF FACTS

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Williamsport, Pennsylvania.

Addressee:

Emanuel Thomas Newman
Reg. No. 13418-039
FCI Pekin
P.O. Box 5000
Pekin, IL 61555-5000

*Michele E. Lincalis*
MICHELE E. LINCALIS
Paralegal Specialist