# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Emanuel Thomas Newman,
    Plaintiff,

# ORIGINAL

Civil no.   1:CV-01-0677

-Vs-

(Rambo, Judge)

Ronald L. Jury, S.I.S.,
et. al.,
    Defendants,

---

## PLAINTIFF'S RECORD / APPENDIX IN SUPPORT OF HIS OPPOSITION
## TO THE DEFENDANT'S SUMMARY JUDGMENT MOTION

---

FILED
HARRISBURG, PA

JUL 1 9 2002

MARY E. D'ANDREA, CLERK
Per_____
      Deputy Clerk

EMANUEL THOMAS NEWMAN
13418-039
F.C.I.PEKIN
P.O. BOX 5000 (MO-1)
PEKIN, ILLINOIS 61555-5000

# TABLE OF CONTENT

ITEM:                                                                NUMBER

PLAINTIFF' AFFIDAVIT...................................    1


WITNESSE'S AFFIDAVIT...................................    2


DEFENDANT'S RESPONSE TO PLAINTIFF'S INTERROGATORIES
CONCERNING BUREAU OF PRISONS POLICY RELATED TO
THREATS KNOWN OF BY STAFF AGAINST INMATES..............    3


MEDICAL REPORTS OF PLAINTIFF'S INJURY'S
AFTER MAY 14, 1999....................................    4


MEMORANDUM FROM OFFICERS PRESENT ON APRIL 16, 1999
CONCERNING WHAT THEY SAW AND PLAINTIFF'S CONDITION.....    5


MEMORANDUM OF STAFF PRESENT ON MAY 14, 1999
CONCERNING WHAT THEY SAW AND PLAINTIFF'S CONDITION
AND WHAT THEY HEARD...................................    6


ADMINISTRATIVE REMEDIES FILED BY PLAINTIFF
CONCERNING FALSE STATEMENTS MADE BY STAFF
THAT HE HAD REFUSED TO TALK WITH THEM ABOUT
THE INCIDENTS THAT TOOK PLACE.........................    7

EXHIBIT #1.

PLAINTIFF'S AFFIDAVIT

STATE OF ILLINOIS)
            ) SS:
COUNTY OF TAZWELL)

### AFFIDAVIT OF EMANUEL THOMAS NEWMAN

That before me appeared, **Emanuel Thomas Newman, Who is of the majority age
of the residences of Tazwell county, Illinois, and he made the following statements
based upon his personal knowledge:**

**1)** That I was incarcerated at U.S.P. Allenwood during all times relevant
to the now pending civil complaint.

**2)** That I have exhausted all Bureau of prisons administrative remedies
procedures, and I was unsuccessful at every level.

**3)** That during the winter of 1998/1999 inmate Kevin Tensley requested my
aid in doing his post conviction pleadings, because he could neither read or write,
and knew nothing about the law. Therefore, I agreed to help him. However, after
reviewing Tensley's legal documents, I discovered that he had been an informant
for the Drug Enforcement Administration. It was at that time I packed up all of
his legal material and returned it to him stating that I could not help him.  I
thought no more of the matter.

**4)** That on April 16, 1999 an inmate who I didn't know at that time (Albert
Gass) without provocation or apparent reason assaulted me with a metal club in the
dish room of    the food services department of U.S.P. Allenwood, where we both
worked. I suffered numerous contusions and cuts, and was taken to the prison
hospital on a gurney, where I received 21 stiches in the head. Furthermore I
remained in the prison hospital under observation for five days, and on the fifth
day I was transferred to the special housing unit as an administrative detainee on
April 21, 1999.

**5)** That S.I.S. lieutenant Ronald L. Jury interviewed me in the special
housing unit on April 21, 1999, in an attempt to determine the cause of the incident.
I explained that I did not know the inmate who had been identified to me as being
Albert Gass, and that I had no idea why he attacked me. At that time Lieutenant
Jury returned me to the general population.

**Page one of five.**

6) That because of the size of the head wound I received during the assault it was necessary for me to have my entire head bandaged. Furthermore, the wound continued to bleed for some three to four weeks after the assault.

7) That on the evening of May 8, 1999, just before institution lock down I was approached by inmate Wayne Jackson, who lived in the same housing unit, and warned that inmate Kevin Tensley been behind the April 16, 1999 assault on my person, and was organizing members of the D.C. Boy's prison gang to murder me, because the first attempt had failed. Right after the conversation with inmate Jackson, I went to the housing unit officer, officer couch and informed him that I had learned of a serious threat to my safety. Our unit was then locked down for the night.

8) That on May 9, 1999 I was escorted to the Lieutenant's office to see Lieutenant Louis Caprio. I detailed about the April 16, 1999 assault, because Lt. Caprio had been on the scene that day. I further related the information that inmate Jackson had made me aware of concerning Tensley, the D.C. Boy's prison gang, and the murder plot. Because inmate Jackson had conditioned his information upon anonymity, I did not tell Lt. Caprio who had given me the information. He then asked me what I wanted him to do? I answered to take whatever measures necessary to ensure my safety. Lieutenant Caprio said he would investigate the matter and get back with me. I was then escorted back to the housing unit.

9) That on May 12, 1999 I was called to the Lieutenant's office for an interview with Lieutenant James White. On my way to that interview I was met by inmate Boby Hazel, who told me that Tensley had offered him money to stab or beat me to death. Inmate Hazel stated that Tensley was afraid that I was going to expose him as an informant to their gang (the D.C. Boy's).

10) That upon arriving at the Lieutenant's office for the interview with Lt. White, I was informed by him that he had been asked to follow up the investigation by Lieutenant Caprio, and that his informants had confirmed that the threat to my safety was very real. I then detailed all that I had learned from inmates Jackson and Hazel.          **Pagr two of five.**

**11)** That Lieutenant White further confirmed that it had been Tensley who had gotten inmate Albert Gass to assault me on April 16, 1999 in the food services department. I asked Lieutenant White as I had asked Lieutenant Caprio to take whatever measures necessary to ensure my safety. Lieutenant White accused me of not telling him the entire story, and claimed that there was more I wasn't telling him. I stated that I had told both him and Lieutenant Caprio everything I knew. At that time he stated that he would look into the matter further and get back with me. I was then returned to the general population.

**12)** That both inmate Jackson and inmate Hazel were waiting for me outside of the Lieutenant's office, and were shocked to see me return to the population. They walked me back to the housing unit where we all parted company.

**13)** On May 14, 1999, inmate Kevin Tensley assaulted me in the housing unit beating me about the head and face with what appeared to be some type of metal weapon, until I was rescued by staff and taken to the prison clinic where I received basic medical treatment. I was then confined to the special housing unit as an administrative detainee until I was once again released into general population.

**14)** That during the assault by Tensley, several officers received wounds from Tensley who was swinging wildly. After the assault Tensley was issued incident reports for the assaults against myself and the officers. However, it was later revealed to me by one of the special housing unit officers, that inmate Tensley had all of the incident reports against him expunged, that he received a sum of money, and was transferred to a low security Federal Correctional Institution on or about August 13, 1999. I remained in administrative detention until December 1, 1999.

**15)** That as a result of the assault by inmate Kevin Tensley my left eye was damaged. I put in repeated inmate to staff request to see the doctor about my vision because I was having problems seeing. There were large spots in my field of vision of my left eye, and the vision blurred occasionally for long periods of time. All of my request went unanswered while I remained in the special housing unit. (See,**EX.2**)

16) That upon my release form the special housing unit, I was seen by the Dr. Wyhatt (an eye doctor) on January 12, 2000 concerning my complaints of large spots in my field of vision and blurred vision in my left eye. (See, **Exhibit # 3.**)

17) That Dr. Wyhatt who had examined me for my eyes since I had arrived at U.S.P. Allenwood stated the following to me: That since he had last examined me in 1998, that a very abnormal amount of debris was floating inside the vitreous humor which fills my left eye ball. Furthermore, that he saw several very large bits of debris that he stated would cause spots in my field of vision. He also stated that there appeared to be a very large piece of debris and that without question that was going to cause spots and blurred vision. He requested to know what had happened, and I detailed the fact that I had not had any problems with large spots or blurred vision in my left eye before being beaten about the head and face with a metal weapon by inmate Kevin Tensley on May 14, 1999. He confirmed, that the beating to eye on May 14, 1999 caused vision loss.  He further stated that during the beating one or more of the blood vessels inside my left eye burst, and leaked blood into the vitreous humor. Thereby creating the spots in my field of vision.

18) That Dr. Wyhatt's conclusion was that the condition would not get any better, and only worsen with age.

19) That I personally was interviewed by both Lieutenant Louis Caprio and James White. I detailed everything that I had been informed of by inmates Boby Hazel and Wayne Jackson, who were both members of the D.C. Boy's prison gang during the time periods cited in my complaint. Furthermore, I sat before them both with my entire head covered by a bandage that soaked through with blood, because the head wound from the first assault was still bleeding. I had bruises covering my face and arms, and my lips and jaw were swollen.

20) That I requested both individuals to take what ever measures necessary to ensure my safety. Both Lieutenant James White and Louis Caprio returned me to the general prison population to be assaulted, even after they had in fact confirmed the threats against my person as being real and serious.

That I further state that I have personal Knowledge of all the events detailed in this affidavit, and that all statements are true, correct, and complete to the best of knowledge and belief. **And, FURTHER I SAYETH NOT.**

By, _Emanuel Thomas Newman_
   Emanuel Thomas Newman
   1341-039
   F.C.I. PEKIN
   P.O. BOX 5000 (MO-1)
   PEKIN, ILLINOIS, 61555-5000

_____ 7-16-02
NOTARY

"OFFICIAL SEAL"
TERRY TURNER
Notary Public, State of Illinois
My Commission Expires 8/11/2003

PAGE FIVE OF FIVE

EXHIBIT #2.

WITNESSES' AFFIDAVITS

STATE OF PENNSYLVANIA )

COUNTY OF UNION )  :SS

## AFFIDAVIT OF WAYNE JACKSON

That I Wayne Jackson, pursuant to Title 28 U.S.C. § 1746 do hereby state that the following is true under the pain and penalty of perjury:

1) That I am an inmate at U.S.P. Allenwood, located in the city of White Deer, Pennsylvania.

2) That I was in food services the day that inmate Emanuel Thomas Newman was assaulted, having my lunch.

3) That I was made aware of a plot to murder inmate Newman that was being taken out by inmate Kevin Tensley.

4) That on or about May 8, 1999 I made inmate Newman aware of the plot against his life, and informed him that it had been inmate Tensley, who had him assaulted on April 16, 1999, because Tensley, who was a B.O.P. informant, had thought that Inmate Newman was going to reveil his status as an informant to the entire inmate population at U.S.P. Allenwood. And specifically to the D.C.Boy's prison gang who Tensley was a member of. (I didnot want my name used)

5) That I was walking by the lieutenant's office on May 12, 1999, when I saw inmate Bobby Hazel standing by the fence. When I asked him what was going on, he stated that Inmate Newman was inside seeing lieutenant White, because the lieutenant had called for him to come down.

6) That upon further investigation I saw inmate Newman through the window of the building containing the lieutenant's office, and lieutenant White was in there with him.

7) That when Newman left the lieutenant's office, both myself and inmate Bobby Hazel walked with him. Newman told us that the lieutenant had told him there was a hit out on his life and that it was inmate Tensley who had put it out on him.

8) That both Bobby Hazel and myself were shocked that Newman was allowed to return to the general population, with a threat against his life. And

FURTHER I SAYETH NOT.

This 4th day of December _____, 1999 A.D.

By Wayne Jackson _____ Certifier.

Wayne Jackson
Reg no. 58074-004
U.S.P. ALLENWOOD
P.O. BOX 3000
WHITE DEER, PA 17887

## Affidavit of Bobby E. Hazel

I, Bobby E. Hazel, being sworn, hereby depose and state the following:

1. I am a prisoner of the United States penitentiary, Allenwood Pennsylvania. My Reg. No. 44097-133. I made this affidavit in the name of prisoner Newsman A.K.A. "Isca" who is being held in administration Detention.

2. In the month of May 1999, prisoner Tensley confronted me complaining about trying to get someone to hurt Isca. I asked Tensley what were the problem, but he never told me. Lateafter I told Isca about Tensley intention, because we were friends.

3. I believe in the same month, I walked with Isca to the Lieutenant office, where I waited for Isca outside. Lateafter, Isca exited the Lieutenant Office, where Isca to me that Lieutenant White told him that D.C. prisoner's have a hit on him, and the Lieutenant thought his life were endanger.

4. Tensley told me personally and I already heard him bragging about the Cop his crew murdered, that got him incarcerated. Also I heard that Tensley is infamous. Upon Isca returned to general population, I were shocked seeing him knowing what I knew what Tensley trying to get Isca hurt.

- 2 -

This affidivit is taken to the best of my knowledge, & I understand making a false statements led to the wolty of perjuny.

*Bobby E. Hazel*

Bobby E. Hazel

Reg. No. 41092-133

P. O. Box 3000

White Deer, Pa 17887

Date: November 29, 1999

# Affidavit of Nigel Williams

I Nigel williams pursuant to 28 usca 1746, DO hereby state the following upon my oath .... that on mar 10 1999 umate Kevin tewsley aka twin approached me and requested me to beat down umate Newman because umate Newman was revealing to the inmate population that he inmate Kevin tewsley was an informant.

   furthermore tewsley stated that his homeboy black had hit newman in the head because of such rumor, and he would take care of it himself but didn't want to mess his transfer up. and if I did this he would have some money sent to my account.

   however due to the fact of inmate tewsley leaving by the time of me meeting up with newman I wouldn't of got paid for my troubles.

                                    Nigel william  06571.052
                                    11.25.99

EXHIBIT #3

DEFENDANT'S RESPONSE TO PLAINTIFF'S
INTERROGATORIES CONCERNING BUREAU OF PRISONS POLICY
RELATED TO THREATS KNOWN OF BY STAFF AGAINST
INMATES

**Response:**   All inmates identified as having been involved in an altercation are placed in the institution's Special Housing Unit in an administrative detention status pending investigation.

4.   List separately the following concerning your answers to #3.

a. What is the official Bureau of Prisons policy concerning the removal of an inmate from the general institution population once a threat has come to the attention of the prison administration?

**Response**:   It is my understanding that if staff are made aware of a threat to a particular inmate(s), that individual is to placed in the institution's Special Housing Unit in an administrative detention status pending investigation.

b.   What is the official Bureau of Prisons policy for the removal of an inmate from the general institution, who has been violently assaulted and makes the prison administration aware of a serious violent threat against his person by members of a prison gang?

**Response**:   It is my understanding that if an inmate is "violently" assaulted, after receiving the appropriate medical care, that inmate is placed in the institution's Special Housing Unit in an administrative detention status pending investigation.

3

j. Was the plaintiff in this case given a waiver to sign, and if so what is the name of the prison staff person who witnessed him sign said document?

**Response**: I am not aware of any such waiver, nor do I know of any other staff member(s) asking the Plaintiff to sign any "waivers" or other forms.

k. If the threat made against an inmate is gang related, and serious in nature (stabbing, murder etc...) would the official Bureau of Prisons Policy cause said inmate to be removed from the institutions general population without his consent even if he requested to sign a waiver?

**Response**: It is my understanding that steps would be taken to remove the threat. These steps may include the removal of the intended victim from the institution's population.

l. Has anyone instructed you on how to respond to these or anyother{sic} questions that this plaintiff might ask in relationship to the now pending civil lawsuit?

**Response**: No, however, I did receive advice and counsel from the legal staff at the institution.

6

EXHIBIT #4.

MEDICAL REPORT OF PLAINTIFF'S INJURY'S
AFTER THE MAY 14, 1999 INCIDENT

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

**INMATE INJURY ASSESSMENT AND FOLLOW-UP**
(Medical)

| 1. Institution | 2. Name of Injured | 3. Register Number |
|---|---|---|
| USP-ALLENWOOD | NEWMAN, EMANUEL | 13418-039 |

| 4. Injured's Duty Assignment | 5. Housing Assignment | 6. Date and Time of Injury |
|---|---|---|
| F/S PM | 3A C-132 | 5-14-99   1700 |

**7. Where Did Injury Happen (Be specific as to location)**
3A - OFFICERS STATION

Work Related? ☐ Yes ☒ No

**8. Date and Time Reported for Treatment**
5-14-99   1730

**9. Subjective:** (Injured's Statement as to How Injury Occurred)(Symptoms as Reported by Patient)

"HE JUST STARTED HITTING ME!"

X HANDCUFFED
Signature of Patient

**10. Objective:** (Observations or Findings from Examination)

POST-ASSAULT → (L) EYE SWOLLEN SHUT, BRUISING/ECCHY ABOUT ENTIRE FOREHEAD (SWOLLEN), SMALL BRUISE ON (R) UPPER CHEST/BREAST AREA, (R) F.A. 2" SCRAPES, (L) ARM/ELBOW ABRASION, SCRAPE IN FRONT OF (R) EAR AREA, SCRAPE ON (L) KNEE. ⊖ TRAUMA NOTED TO HANDS. ⊖ OTHER GROSS TRAUMA TO NOSE OR ORAL CAVITY.

X-Rays Taken ____ Not Indicated ☒
X-Ray Results

**11. Assessment:** (Analysis of Facts Based on Subjective and Objective Data)

NAD, AMBULATES w/ NO DIFFICULTY, SPEAKS CLEARLY, MULTIPLE TRAUMA TO FACIAL AREA, ORAL CAVITY INTACT, LITTER TO NO EXT. HEMMO, WATCH FOR ↓ LOC.

**12. Plan:** (Diagnostic Procedures with Results, Treatment and Recommended Follow-up)

1. FULL VISUAL ASSESSMENT.
2. GIVE HIM ICE WHILE IN SHU.
3. ISSUE X 8 200 MG MOTRIN IN SHU IF NO ↓ IN LOC.
4. ADVISE STAFF PROMPTLY IF ANY Δ. SHU PA TO F/U ON MON.

**13. This Injury Required:**

☐ a. No Medical Attention
☒ b. Minor First Aid
☐ c. Hospitalization
☐ d. Other (explain)
_____
_____

☐ e. Medically Unassigned
☐ f. Civilian First Aid Only
☐ g. Civilian Referred to
Community Physician

E.T. RARICK, EMT-P
USP ALLENWOOD
Signature of Physician or Physician Assistant

SCRAPE
BRUISING/SWELLING/GROSS ECCHY.
SWOLLEN SHUT ECCHY.
ABRASIONS
SCRAPES
SMALL BRUISE
ABRASION

SK Lee
SUNG K. LEE, M.D.
USP ALLENWOOD
5/19/99

Original - Medical File
Canary - Safety
Pink - Work Supervisor (Work related only)
Goldenrod - Correctional Supervisor

USP LV8

Self Carboned Form – If ballpoint pen is used. PRESS HARD

BP 3876(60)



USP Allenwood
P.O. Box 3500
White Deer, PA 17887

EXHIBIT #5.

**MEMORANDUM FROM OFFICERS PRESENT ON APRIL 16, 1999**
**CONCERNING WHAT THEY SAW AND PLAINTIFF'S CONDITION**



U. S. Departme.  of Justice

Federal Bureau of Prisons

*U. S. Penitentiary, Allenwood*

*White Deer, PA 17887-3500*

April 19, 1999

MEMORANDUM FOR OPERATIONS LIEUTENANT

FROM:    S. PISARSKI, ACTING ACTIVITIES LIEUTENANT

SUBJECT: Incident in Dish Room
         (Newman #13418-039 &  (b)(7)(c)

    On April 16, 1999, I and was supervising the noon meal in the
dining hall. At approximately 12:00 P.M. Cook Foreman Rabb ran
towards myself and Lieutenant Caprio and stated " I need
assistance in the dish room." I immediately ran into the dish
room where I observed two inmates struggling on the floor between
the dish machine and the tray conveyer belt. The two inmates were
later identified inmate Newman #13418-039 and   (b)(7)(c)
    Upon my arrival to the incident inmate Newman was on top of
 (b)(7)(c)    holding him down. Both inmates were covered in blood.
Both inmates were separated and restrained. (b)(7)(c)    continued
to struggle with staff after being separated and appeared to be
the aggressor in the incident.
    I assisted Lieutenant Caprio in escorting  (b)(7)(c)    to the
institutional hospital by clearing out all uninvolved inmates out
of the north end of the dining hall and corridor area. (b)(7)(c)
    and inmate Newman were escorted to the institutional
hospital.
    While in the institutional hospital I remained with (b)(7)(c)
    while the medical staff accessed his injuries. I asked
 (b)(7)(c)    what happened and he stated " That dude was playing
with me. When I told him to stop he picked up a pan. I then got
the piece of metal from the dish machine and hit him in the
head."    (b)(7)(c)





*U.S. Department of Justice*

*Federal Bureau of Prisons*

*U.S. Penitentiary, Allenwood*

---------------------------------------------------------------------------------------

*White Deer, PA 17887-3500*

April 16, 1999

MEMORANDUM FOR INVESTIGATING LIEUTENANT

FROM:    D.Dunkleberger, Senior Officer

SUBJECT:    Assistance Call in Food Service

On 16 April 99 at approximately 12:00 p.m. I responded to a call for assistance in Food Service. Upon arriving at the scene I noticed inmate Newman, Emanual REG#13418-039 staggering backwards behind the dish machine. I immediately secured inmate Newman and placed him on the floor. Inmate Newman was bleeding severely from the back of the head. I secured a towel and applied direct pressure to the wound on inmate Newman's head. I remained with inmate Newman until medical assistance arrived. I then helped place inmate Newman on a gurney and moved him to the Institutional Hospital. I remained with inmate Newman until medical staff closed the wound on his head.

EXHIBIT # 6.

**MEMORANDUM OF STAFF PRESENT ON MAY 14, 1999
CONCERNING WHAT THEY SAW AND PLAINTIFF'S CONDITION
AND WHAT THEY HEARD**



**U. S. Department of Justice**

Federal Bureau of Prisons

*U. S. Penitentiary, Allenwood*

*White Deer, PA 17887-3500*

May 14, 1999

MEMORANDUM FOR: V. GONZALES, LIEUTENANT     Noted

FROM:     S. Hanis, C.O.

SUBJECT: Response to ▮▮▮▮ alarm in Unit IIIA.


On the above date at approximately 5:00 PM I responded to ▮▮▮▮ alarm in Unit IIIA. Upon arrival in the unit I proceeded to the Unit Officer's station and along with other responding staff I grabbed inmate Tinsely ▮▮▮▮▮ in order to control the inmate. Inmate Tinsely ▮▮▮▮▮ continued to resist and was forced to the ground by myself and other responding staff. I along with other responding staff continued to hold inmate Tinsely ▮▮▮▮▮ on the ground until the inmate was cuffed and the situation was under control. Inmate Tinsely ▮▮▮▮▮ was then escorted to the hospital without further incedent.

During this situation I recieved a laceration to my little finger on my left hand. The laceration was treated by P. A. Rarick and an injury assessment was completed.



**U. S. Department of Justice**

Federal Bureau of Prisons

*U. S. Penitentiary, Allenwood*

---

*White Deer, PA 17887-3500*

May 14, 1999

Memorandum for Investigating Lieutenant

Thru:      Lieutenant V. Gonzales, Operations Lieutenant and
           Lieutenant M. Gayton, Activities Lieutenant

From:      B. Brubaker, Senior Officer

Subject:   ████ assistance call in Unit IIIA Involving Inmate Tinsley, K. ████████
           And Inmate Newman, ████████

On May 14, 1999, at approximately 4:55 PM I responded to the ████ call in Unit IIIA. When I arrived in the unit I noticed that the incident was taking place in the Unit officer station. Once there, I assisted in subdue Inmate Tinsley, who was resisting staff. Inmate Tinsley was placed on the floor were he was restrained. Myself and other staff maintained control of Inmate Tinsley until the unit was locked down. At this time Inmate Newman stated "Were you trying to kill me". Several minutes later the video camera was started. Myself and other staff escorted Inmate Tinsley to the Institution Hospital for examination. I collected the clothing of inmates involved. Then I escorted Inmate Tinsley to Special Housing Unit with no further incidents. A inventory of clothing was conducted.

Later Lieutenant V. Gonzales conducted a video documentation of the incident and the officers who were immediately involved. The staff that was involved was Officers: J. Peters, S. Hanis, L. Shults, R. Antonacci, D. Kreibel, J, Nash, And camera operator W. Beck.

EXHIBIT #7.

ADMINISTRATIVE REMEDIES FILED BY PLAINTIFF
CONCERNING FALSE STATEMENTS MADE BY STAFF
THAT PLAINTIFF HAD REFUSED TO CONVERSE WITH THEM ABOUT
THE INCIDENTS MAY 14, 1999 OR APRIL 16, 1999

# COP-OUT

July 5, 1999

TO: SIS Officer Toll:

Sir, May I Please Be Informed of

The Status of My Investigation.

I have Been In Administrative Seg since

May 14, 1999, without Knowing What is

going On. From Reading the Program Statement

Concerning A.d., I am entitle to Know what

the Status of the Present Investigation is

Emanuel Thomas Newman          13418-039

Ad - Seg                       Cell # 110

**U.S. Department of Justice**

Federal Bureau of Prisons

*U.S. Penitentiary, Allenwood*

---

White Deer, PA  17887-3500

June 7, 1999

MEMORANDUM FOR Newman, Emanuel
            Reg. No. ▆▆▆▆▆▆
            Unit SHU

FROM:            M. Toll, SIS Lt.

SUBJECT:        Inmate Request to Staff Member Response

You stated in your correspondence to me that you do not know whats going on with your investigation.

The SIS office is completed with both of the investigations you were involved with.  It is the determination and recommendation of this office that you receive a transfer.  As you know, you were assaulted on April 16, 1999, in the food service department, and once again on May 14, 1999, in Unit IIIA.  <u>Due to your uncooperative behavior and unwillingness to provide information about both of these assaults, this office cannot make a clear determination of the facts of why you were assaulted.</u>  Therefore, this office believes your safety would be in jeopardy if you were to return to the general population.



**U. S. Department of Justice**

Federal Bureau of Prisons

*U.S. Penitentiary, Allenwood*

White Deer, PA 17887-3500

September 27, 1999

MEMORANDUM FOR NEWMAN, EMANUEL
                        REG. NO. ▮▮▮▮▮▮▮
                        SPECIAL HOUSING UNIT

FROM:                 John F. Fanello, Warden

SUBJECT:          Inmate Request to Staff Member Response

I received your Inmate Request to Staff Member dated September 17, 1999, in which you are
requesting to be returned to the general population at USP Allenwood.

A review of your status reveals that you had been assaulted twice in a one month period.  The
Special Investigative Supervisors' Office (SIS) recommended that you receive a transfer.  The SIS
Office attempted to interview you twice in the Special Housing Unit concerning these assaults;
however, you refused to see the SIS staff.   Therefore, the SIS Office has no alternative but to
perceive there is a threat to your safety if you were to return to the General Population at this
institution.

I trust I have addressed your concerns.

ALP-1330.13D
September 1, 1999
Attachment 1

# United States Penitentiary
# Allenwood, Pennsylvania

## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES
## INFORMAL RESOLUTION FORM

NOTE TO INMATE: You are advised that prior to receiving and filing a Request for Administrative Remedy Form BP-9 [BP-229(13)], you MUST attempt to informally resolve your complaint through your Correctional Counselor Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally and state the names of staff contacted.

Issued By: _____GEG_____ (Initials of Correctional Counselor)
Date Issued To The Inmate: __12/21/99__

INMATE'S COMMENTS:

1. Complaint: That while in the S.H.U. from May 14, 1999 to December 1, 1999 I filed a number of inmate to staff administrative remedies i.e. cop-outs, Bp-8's etc... The vast majority went unanswered, nor were the original documents returned to me, thereby causing all remedies addressed to the warden and or region to be rejected. Please, read and respond to the attached inmate to staff complaints.

2. Efforts you have made to informally resolve: Cop-outs, Bp-8, Bp-9's, Bp-10's filed to Lt. Gaytan, Case manager Kiser, and correctional counselor Gallack, no concerns addressed at all by staff persons.
   *Concern to address : Why did my inmate to staff remedies go unanswered.

3. Names of staff you contacted: Lt. Gaytan, Case Manager Kiser, Correctional counselor Gallack, The regional Director, and the Wardens office.

Date Returned to Correctional Counselor: __December 23, 1999__

_____     __13418-039__     __Dec 23, 1999__
Inmate's Signature              Reg. Number            Date

CORRECTIONAL COUNSELOR'S COMMENTS:

1. Efforts made to informally resolve and staff contacted: Keep in mind while in S[HU] unless you directly hand something to a staff member, it gets sent to them via mail. Rest assured any mail, IE: inmate requests, remidies, etc. received by your Unit Team was answered or remedies turned in. If issues are still unresolved regardless of reason you should address them again at this time. While you are currently back in population this would make it easier to follow up on any requests or remedies sought.

Date BP-9 Issued: _____

_G. Gallick, Counselor Unit IIIA_
Correctional Counselor

_____
Unit Manager (Date)

**U.S. Department of Justice**

**Regional Administrative Remedy Appeal**

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR-9 including any attachments must be submitted with this appeal.

From: **Newman, Emanuel, Thomas**    **13418-039**    **Admin-Seg**    **U.S.P. Allenwood**

      LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

**Part A—REASON FOR APPEAL**

That petitioner is being denied a written copy of of the decision and bases for his continued administrative detention on August 13, 1999 inmate Tensley was transfered out. On October 28, 1999 inmate Gass was transfored out. Therefore, there is no threat on the compound to myself. Furthermore, petitioner did demand to make a statement concurning both assaults and theae relationship. Therefore, why is this petitioner being punished with PROLONGED-INDEFINATE administration detention. Why hasn't petitioner been put back in general population or transfored.

**\* SEE ATTACHMENT**

**11/8/99**
DATE          SIGNATURE OF REQUESTER

**Part B—RESPONSE**

_____          _____
DATE                                 REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                        CASE NUMBER: **200195 R**

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**Part C—RECEIPT**

                                           CASE NUMBER: _____

Return to: _____

          LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

_____
USP LVN    DATE      Previous editions not usable         SIGNATURE, RECIPIENT OF REGIONAL APPEAL

BP-230(13)
APRIL 1982

U.S.P. ALLENWOOD          DATE: NOVEMBER 8, 1999     Emanuel T. Newman
                                                     EMANUEL T. NEWMAN
                                                     13418-039

PETITIONER WAS ASSAULTED ON APRIL 16, 1999, STAYED IN HOSPITAL 5 DAYS, WAS
INTERVIEWED BY S.i.S. LT. JURY. PETITIONER MADE A STATEMENT CONCERNING ASSAULT AND
WAS RETURNED TO POPULATION. ON MAY 14, 1999 PETITIONER WAS ASSAULTED A SECOND
TIME IN A RELATED INCIDENT, AND PLACED IN Ad-SEG. FROM MAY 14, 1999 TO SEPT 20, 1999
PETITIONER FILED ADMINISTRATIVE REMEDIES WITH STAFF FOR AN INTERVIEW CONCERNING
BOTH ASSAULTS. "NO STAFF CAME TO SEE ME AT ALL AFTER MAY 14, 1999 ASSAULT." I FILED
A BP-9 TO WARDEN, BECAUSE UNIT TEAM FAILED TO RESPOND TO BP-8'S. ON OCTOBER
15, 1999 LT. GAYTAN CAME TO SEE ME. AFTER REVIEWING MY CLAIM AND BP-9, HE
GAVE ME MY FIRST INTERVIEW RELATED TO ASSAULTS, ON OCTOBER 21, 1999. PETITIONER
RAISED 2 ISSUES. ① THAT I RETURN TO POPULATION, BECAUSE BOTH PERSONS WHO ASSAULTED
ME WERE TRANSFERED OUT. ② OR, THAT THE FALSE STATEMENTS CONCERNING
PETITIONER HAVING TWICE REFUSED AN S.i.S INTERVIEW; THEREBY BEING LABLED
UNCOOPERTIVE DURING AN INVESTIGATION BE REMOVED FROM ALL RECORDS
AND I BE ALLOWED TO MAKE A STATEMENT.

      LT. GAYTAN DETERMINED THAT: "NO STAFF PERSON" HAD COME TO SEE ME
CONCERNING THE MAY 14, 1999 ASSAULT AND IT'S RELATIONSHIP TO THE APRIL 16, 1999
ASSAULT, S.i.S. OR OTHERWISE. AND THAT HE WOULD ATTEND THE SEG REVIEW
MEETING AND INQUIRE INTO PETITIONER EITHER RETURNING TO POPULATION
OR TRANSFERING, A.S.A.P. PETITIONER MADE RELATED STATEMENTS AT THAT
TIME. PETITION THEN PER HIS REQUEST SUBMITTED A COP-OUT STATING THAT HIS
CONCERNS TODATE HAD BEEN MET. ON OCTOBER 25, 1999 LT. KRYER OF S.i.S. CAME
TO SEE ME AND SAID SHE WAS THERE FOR LT. GAYTAN, AND I POSATIVELY COULD NOT
RETURN TO POPULATION AND TO GET BACK WITH HER OR GAYTAN IN 2 OR 3 MONTHS
ABOUT TRANSFUR. ISSUE: PETITIONER HAS BEEN DENIED A WRITTEN COPY
OF THE DECISION AND BASES FOR SAME. PETITIONER IS ENTITLED UNDER 28 C.F.R.
541.22. PETITIONER WISHES TO KNOW WHY HE IS BEING HELD IN Ad-SEG 180 DAYS
PLUS, AND BOTH PERSON WHO ASSAULTED HIM HAVE BEEN TRANSFERED OUT.
* PETITIONER MADE REPETED REQUEST TO STAFF FOR BP-8, BP-9, BP-10 FORMS,
BUT PETITIONER'S COUNSELOR HAS ONLY VISITED HIM 3 TIMES IN THE LAST 6 MONTHS,
AND BECAUSE TIME WAS RUNNING OUT TO APPEN, PETITIONER WROTE BP-10 OUT
BY HAND. (20 DAY TIME LIMIT)



U.S. Department ( Justice

Federal Bureau of Prisons

*U.S. Penitentiary, Allenwood*

_____

*White Deer, PA  17887-3500*

November 17, 1999

MEMORANDUM FOR NEWMAN, EMANUEL
              REG. NO. 13418-039
              SPECIAL HOUSING UNIT

FROM:          John F. Fanello, Warden

SUBJECT:       Inmate Request to Staff Member Response

This is in response to your Inmate Request to Staff Member dated November 8, 1999.  You request to be allowed to return to general population, because two inmates are no longer housed in general population and you allege that you have been incorrectly labeled as uncooperative during the prior investigations.

Our investigation revealed that on June 17, 1999, you were submitted for transfer due to separations issues.  While the basis for the transfer included two assailants who were previously identified and transferred, it is perceived by staff that you have been labeled by other inmates at USP Allenwood as a possible target for violence.

The information utilized to formulate the conclusion for reports involving your assault (s) contains statements from other inmates and access can not be granted.

I believe this response will adequately address your concerns.

MOUSR

## U.S. DISTRICT COURT
## MIDDLE DISTRICT OF
## PENNSYLVANIA

EMANUEL THOMAS NEWMAN,

      Plaintiff,

Vs.

Ronald L. Jury, LT, SIS, ET AL.,

      Defendant,

Civil No.: 1:CV-01-0677

(Rambo, Judge)

## CERTIFICATE OF SERVICE BY MAIL

    The undersigned plaintiff hereby certifies that persuant to 28 U.S.C. § 1746, the following is true.

    That I, Emanuel Thomas Newman, have placed sufficient postage for First Class mailing to all the defendant's via their attorney upon who I am serviing all documents. (RECORD / APPENDIX IN SUPPORT OF OPPOSITION TO SUMMARY JUDGEMENT BY DEFENDANTS)

This ___16Th___ day of ___July___, 2002

By, _Emanuel Thomas Newman_

    Emanuel Thomas Newman 13418-039
    P.O. Box 5000
    Pekin, Illinois 61555-5000

COPIES TO:    U.S. Attorney
            316 Federal Building
            240 West Third Street
            Williamsport, PA 17703

            Clerk Of The Court
            U.S. District Court
            228 Walnut Street
            P.O. Box 983
            Harrisburg, PA 17108