#67
1 30 03

# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

EMANUEL THOMAS NEWMAN,          :
                                :
                 Plaintiff      :     CIVIL NO. 1:CV-01-0677
                                :
          v.                    :     (Judge Conner)
                                :
RONALD L. JURY, Lieutenant,     :
SIS, et al.,                    :
                 Defendants     :

FILED
HARRISBURG
JAN 3 0 2003
MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

## <u>ORDER</u>

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Plaintiff, Emanuel Thomas Newman, formerly an inmate at the Allenwood

United States Penitentiary ("USP-Allenwood"), White Deer, Pennsylvania,[1] filed

the captioned <u>Bivens</u>[2] action pursuant to 28 U.S.C. § 1331.  The defendants, all

employees of USP-Allenwood, are Louis Caprio, Ronald Jury and James White.

Plaintiff alleges that these staff members allowed him to be assaulted by another

inmate, despite the fact that plaintiff sought defendants' protection prior to the day

of the assault.

----

1.    Plaintiff is presently incarcerated in the Federal Correctional Institution, Oxford, Wisconsin.

2.    <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971). <u>Bivens</u> stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." <u>Butz v. Economou</u>, 438 U.S. 478, 504 (1978).

On April 23, 2001, the court granted plaintiff's application to proceed in forma pauperis and directed the U.S. Marshall to serve the complaint on defendants. (Doc. 7). On March 14,2002, plaintiff filed a motion to voluntarily dismiss defendant Jury. (Doc. 44). By Order dated March 19, 2002, defendant Ronald L. Jury, was dismissed with prejudice, pursuant to Fed.R.Civ.P. 41(a). (Doc. 45).

On June 20, 2002, the remaining defendants filed a motion for summary judgment. (Doc. 51). The parties fully briefed the issues and the motion is now ripe for disposition. For the reasons discussed below, the motion will be denied.

**Summary Judgment Standard**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001). A material fact is defined as one that will affect the outcome of the case under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party." Reeder v. Sybron Transition Corp., 142 F.R.D. 607, 609 (M.D. Pa. 1992) (citing White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988)); Saldana, 260 F.3d at 232.

2

When deciding a motion for summary judgment, the court does not weigh the evidence for the truth of the matter, but simply determines "whether there is a genuine issue for trial." Schnall v. Amboy Nat. Bank, 279 F.3d 205, 209 (3d Cir. 2002)(citing Anderson, 477 U.S. at 249). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in the complaint; instead, it must 'go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specified facts showing that there is a genuine issue for trial.'" Schiazza v. Zoning Hearing Bd., Fairview Twp., York County, Pennsylvania, 168 F. Supp.2d 361, 365 (M.D. Pa. 2001) (citing Celotex Corp v. Catrett, 477 U.S. 317, 324 (1986)). See also Saldana, 260 F.3d at 232. Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party' case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322-23. Further, an opposing party cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit. Liberty Lobby, 477 U.S. at 256-57.

3

**Discussion**

With the above principles in mind, the court will address the allegations in the complaint, the materials and documentation submitted by the defendants to pierce these allegations, and the response submitted by the plaintiff in an attempt to controvert the defendants' materials and to demonstrate that there exists a triable issue of material fact.

The plaintiff alleges that in the winter of 1999 he was asked by inmate, Kevin Tinsely to "advise and help him with his post-conviction legal filing, because Tinsely was illiterate and unfamiliar with the law." (Doc. 1). In the course of reviewing Tinsely's legal papers, Newman learned that Tinsely had been an informant for the Drug Enforcement Administration and "for that reason Newman returned the papers to Tinsely and told him that he would not be able to assist him." Id. Thereafter, Newman "thought the matter closed and thought no more about it." Id.

On April 16, 1999, inmate, Albert Gass "suddenly and without provocation or apparent reason assaulted Newman with a metal club in the dish room of Allenwood's Food Services Department, where both worked." Id. Newman suffered numerous contusions and cuts and was taken to the hospital where he received twenty-one (21) stitches in his head. He remained in the hospital for five days and was transferred to the Special Housing Unit on April 21, 1999 as an administrative detainee. That same day Newman was interviewed by Lt. Jury, in

4

an attempt to determine the reason for the assault. Newman explained that he was not well acquainted with Gass and had no idea why Gass would attack him. Lt. Jury then released Newman to the general population. Id.

On May 8, 1999, inmate, Wayne Jackson informed plaintiff that "an attempt to murder Newman was being planned." (Doc. 1). According to Jackson, "inmate Kevin Tinsely was organizing members of the prison gang, the D.C. Boys, to accomplish the killing." Id. Newman claims that "right after this conversation with Jackson and just before the nightly unit lock down at 10 p.m., Newman informed unit Officer C.O. Couch that he had learned of a threat to his safety." Id.

On May 9, 1999, Newman was called to meet with Lieutenant Caprio. Newman "recalled the assault by Gass (Caprio had come to the scene on April 16, 1999) and related the information given to him by inmate Jackson about the planned murder." Because inmate Jackson asked to remain anonymous, Newman declined to furnish Jackson's name as his source of information about the planned murder. Newman "asked Lt. Caprio to take whatever measures were appropriate to ensure his safety." Id. Lt. Caprio said he would investigate and get back to Newman. Id.

Three days later, on May 12, 1999, Newman was called to an interview with Lt. White. Just before going to the interview, inmate Bobby Hazel told Newman that "he had refused an offer from Tinsely to pay him for stabbing or beating

5

Newman." (Doc. 1). Hazel explained that Tinsely was "afraid that Newman would tell other convicts that Tinsely had worked as a DEA/BOP informant." Id.

At the interview, Lt. White told Newman that inmate informants had confirmed the existence of the threat Newman had reported earlier to Caprio, "that inmate Tinsely had hired the D.C. Boys to assault or kill Newman." Id. In addition, White told Newman that "it had been Tinsely who had gotten Gass to attack Newman on April 16, 1999." Id. Newman "repeated his fears for his life to Lt. White and related the additional information Hazel had given to him." Id. Newman then asked Lt. White "to take appropriate measures to safeguard him." Id. Newman claims that Lt. White stated that "before he could take any action he would investigate and get back to him." Id.

On May 14, 1999, Tinsely attacked Newman in the housing unit, "beating him severely and repeatedly about the head and face, with his fist and what [plaintiff] believed to be some type of weapon." (Doc. 1). Newman states that "after he was rescued by staff, he was examined and treated in the prison clinic and then confined in Administrative detention until his release into general population on December 1, 1999." Id.

Newman claims that as a result of the assault he has suffered "extreme pain, dangerous head injuries and continuing significant loss of vision." Id. Moreover, he states that "between May 8th and May 14th, 1999, [he] suffered severe anxiety and fear for his life, arising in significant part from his unsuccessful

6

attempts to obtain protection from Lieutenants Caprio and White." Id. He claims

that his "fear was intensified by the risk he incurred in providing detailed

information to Caprio and White about the threatened assaults, knowing that if it

became know within the inmate population, other threats might arise." Id.

Newman filed the instant action in which he seeks compensatory and

punitive damages for defendants' "deliberate indifference to his safety and

welfare." Id.

To pierce these allegations, the defendants have submitted a statement of

material facts (Doc. 55), along with supporting documentation and affidavits (Doc.

56), which indicate that on April 16, 1999, at approximately 11:55 a.m., a call for

assistance was made by staff in USP-Allenwood's Food Serve Dish Room. Staff

who responded to the call observed the plaintiff and inmate Albert Gass struggling

with one another on the floor in the dish room. The inmates were separated and

escorted to the institutional hospital for treatment for their injuries. Newman

remained in the Health Services Unit for continuing medical care for his injuries

until April 21, 1999, at which time he was placed in the Special Housing Unit (SHU)

in an administrative detention status pending an investigation. (Doc. 56, copy of

Administrative Detention Order).

On April 17, 1999, Newman requested to speak with Lieutenant Forrest

Farmer concerning the assault which took place the day before. (Doc. 56, Affidavit

of Forrest Farmer). Newman told Lt. Farmer that Gass had assaulted him because

7

for the past few weeks Gass had been attempting to get Newman to give Gass

commissary items in return for protection. <u>Id.</u> Newman stated that he had told

Gass that he had been locked up for a long time and refused to be extorted.

Therefore Newman ignored Gass. <u>Id.</u> The plaintiff then told Lt. Farmer that on

April 16, 1999, during the serving of the noon meal, he had been working on the

north side of the dish room, next to the entrance door. <u>Id.</u> He noticed that all of

the other inmates had departed the dish room except for Gass. <u>Id.</u> According to

Newman, Gass then approached Newman and struck him in the head with a blunt

object. <u>Id.</u> Newman said he broke away from Gass and tried to leave the dish

room, but the door was locked. <u>Id.</u> Newman ran around the dish machine when

Gass caught him, so Newman grabbed Gass and took him to the floor, where he

held Gass until the Food Service Foreman arrived. <u>Id.</u>   Newman told Lt. Farmer

that the only reason he was telling him what happened was because he felt Gass

was trying to kill him. <u>Id.</u> He did not want Gass to get away with the assault even

though he might be branded a "snitch." <u>Id.</u>

     Following this discussion with Newman, Lt. Farmer prepared a

memorandum summarizing their conversation and provided a copy to the Acting

Captain. <u>Id.</u>

     On May 9, 1999, defendant, Lt. Caprio was informed by Correctional

Officer Couch that an unidentified inmate had approached him and stated, "You

might want to watch out for Newman if he keeps running his mouth." (Doc. 56,

Affidavit of Louis Caprio). Based on this information, staff located Newman and escorted him to the Lieutenant's Office to be interviewed regarding the statement made by the unidentified inmate. Id. Lt. Caprio told Newman that he heard that he may be having problems in the general population. Newman stated that he was not involved with anyone and pleaded not to be placed in the SHU. Id. According to Newman, he had a minor argument with inmate Kevin Tinsley a few weeks earlier. Specifically, Newman said that he had done some legal work for Tinsley and tried to be honest with him by telling him that it did not look like he was going to be able to beat the case. Tinsley told Newman that it was his job to make it work and make it look good. Id. Newman told Lt. Caprio that he did not want to get involved with Tinsley and left it at that. Id. Newman said he had no problems with Tinsley, which he stated was obvious from the fact that they had been on the compound together since the argument and nothing had happened between them. He further stated that he got along with everyone and that somebody would have to be "brain dead" to mess with him or any of his people (referring to the Nation of Islam). Id. Newman stated that he was an old man and if he felt threatened, he would come to the Lt's Office before anything happened. He pleaded not to be removed from general population and placed in the SHU. He requested that he be allowed to remain in general population and assured Lt. Caprio that he knew of no threat to his safety. Based upon the investigation which failed to reveal evidence that a specific threat existed to Newman, and Newman's own request to stay in

general population, Lt. Caprio concluded the interview and allowed Newman to remain in general population.  Id.

      Had the plaintiff actually informed Lt. Caprio of a specific threat to his safety and asked that appropriate measures be taken to protect him, the defendant would have placed Newman in the SHU in administrative detention pending further investigation.  Id.

      To further pierce the allegations in the complaint, defendant White, the other remaining defendant in this action, submits his affidavit in which he states that contrary to the allegations in the complaint, Lt. White did not interview the plaintiff on May 12, 1999.  (Doc. 56, p. 25, Affidavit of Jimmie White).  Additionally, Lt. White does not recall Newman ever approaching him and asking him to take measures to ensure his safety.  Id.  Had Newman done so, Lt. White states that he would have placed Newman in the SHU in administrative detention pending an investigation.  Id.

      Defendants do not dispute the fact that Newman was assaulted by inmate Tinsley on May 14, 1999.

      In an attempt to counter the materials submitted by Caprio and White, the plaintiff has submitted his own affidavit as well as unsworn declarations of fellow inmates, Wayne Jackson, Bobby E. Hazel, and Nigel Williams.  (Doc. 62).

      Newman's affidavit reiterates the allegations in the complaint that Newman met with, and informed, both Lt. Caprio and Lt. White of the threat by

Tinsely and requested both to "take whatever measures necessary to ensure [plaintiff's] safety." (Doc. 62, Affidavit of Emanuel Newman).

Inmate Nigel Williams states that on May 10, 1999, Kevin Tinsley approached him and "requested that he beat down inmate Newman because inmate Newman was revealing to the inmate population that he inmate Kevin Tinsley was an informant." (Doc. 62, Declaration of Nigel Williams). Inmate Bobby Hazel also claims that sometime during the month of May, 1999, inmate Tinsley "confronted [Hazel], complaining about trying to get someone to hurt" Newman. (Doc. 62, Declaration of Bobby Hazel).

To further dispute defendants' statements, Jackson avers that on the morning of May 12, 1999, he was walking by Lt. White's office when he saw inmate Hazel standing by the fence. (Doc. 62, Declaration of Wayne Jackson). When asked what he was waiting for, Hazel replied that Newman was inside seeing Lt. White, because the Lieutenant had called for him. Id. He states that he then looked through the window of Lt. White's office and saw Newman in there with him. Id. When Newman left the office, both Jackson and Hazel walked with him. Newman stated to both that Lt. White told him that "there was a hit out on his life and that it was inmate Tinsley who had put it on him." Id.

In further support of the fact that this meeting occurred, plaintiff states that among the documents requested in discovery were the records of the officers' institutional pass books. (Doc. 60). Although the defendants claim that these

11

documents are unavailable, plaintiff claims that they did admit in their answers to plaintiff's interrogatories that such records were kept to track where each inmate is at all times, and that no inmate movement is allowed without an institutional pass. Id. Plaintiff argues that the institutional pass log books would further support the fact that plaintiff was called to Lt. White's office to meet with him. Id.

Based on the foregoing, it is apparent that material issues of fact exist with respect to whether defendants knew of a sufficiently serious danger to the plaintiff, thereby barring the grant of summary judgment in favor of the defendants.

The Eighth Amendment's prohibition against the infliction of cruel and unusual punishment has been interpreted to impose upon prison officials a duty to take reasonable measures "to protect prisoners from violence at the hands of other prisoners." Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997)(quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994). Although, "[i]t is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for a victim's safety," "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' " Farmer, 511 U.S. at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 345 (1981). A plaintiff, however, must prove more than that he had a fight with another inmate, see Beard v. Lockhart, 716 F.2d 544, 545 (8th Cir. 1983), and mere negligent conduct that leads to serious injury of a prisoner by another prisoner does not expose a prison official to liability under § 1983. Davidson v.

12

Cannon, 474 U.S. 344, 347-48 (1986). To succeed, a prisoner mush show that: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (3) the defendant actually drew this inference; and (4) the defendant deliberately disregarded the apparent risk. Farmer, 511 U.S. at 834-37.

In determining whether a defendant was deliberately indifferent, the court must "focus [on] what a defendant's mental attitude actually was (or is), rather than what it should have been (or should be)." Hamilton v. Leavy, 117 F.3d at 747. The test for deliberate indifference is not objective; rather, the court must look to what the prison official actually knew. "A prison official's knowledge of a substantial risk is a question of fact and can, of course, be proved by circumstantial evidence." Id. In other words, it may be concluded that a prison official knew of a substantial risk from the very fact that the risk was obvious. The Farmer Court explained in hypothetical terms the type of circumstantial evidence sufficient for a finding of actual knowledge on the part of a prison official:

> [I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.'

Farmer, 511 U.S. at 842-43.

13

Thus, in order to survive defendants' motion for summary judgment, Newman is obligated to produce sufficient evidence to support the inference that defendants "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm." Beers-Capitol v. Whetzel, 256 F.3d 120, 132 (3d Cir. 2001). It is not enough to assert that a defendant should have recognized the risk; the evidence must be sufficient to support the inference that "the defendant must have recognized the excessive risk and ignored it." Id. at 138.

In this case, it is undisputed that Emanuel Newman was assaulted at the hands of another inmate. The central issue is whether defendants Caprio and White knew or should have known of a serious risk of harm and were deliberately indifferent to it. Defendant Caprio argues that he was not indifferent to a dangerous situation. To the contrary, his investigation failed to reveal evidence that a specific threat existed to Newman. According to defendant Caprio, Newman requested to stay in the general population and Lt. Caprio acquiesced to Newman's request. Lt. White simply denies ever meeting with plaintiff and denies being aware of a threat to plaintiff. The plaintiff, however, disputes these facts, arguing that a meeting took place with both officers and that both officers were put on notice of a threat to plaintiff's safety.

A resolution of these factual issues depends upon an assessment of witness credibility. Issues of credibility are for the trier of fact. See Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473 (1962) ("It is only when the witnesses

14

are present and subject to cross-examination that their credibility and the weight

to be given their testimony can be appraised. Trial by affidavit is no substitute for

trial by jury which so long has been the hallmark of 'even handed justice.' "). Thus,

the defendants' motion for summary judgment will be denied.

AND NOW, this 30th day of January, 2003, it is hereby ORDERED that:

1.    The defendants' motion for summary judgment (Doc. 51) is
      DENIED.

2.    This case will be set for trial at the convenience of the court.


CHRISTOPHER C. CONNER
United States District Judge